## THE ALEXANDER McDOUGALL. THE W. LE BARON JENNEY. HANNA TRANSIT CO. v. PITTSBURGH S. S. CO.[*]

(District Court, W. D. New York. February 18, 1921.)

### No. 1119.

Shipping ⬥86(2)—Stranding of steamship held not due to crowding by meeting vessel and tow.

Evidence *held* not to sustain the burden of proof resting on a libelant to show that the stranding of a steamship at the head of a cut channel was due to the negligent and unskillful navigation of a meeting steamship and tow, which crowded her from her proper course to enter the cut.

In Admiralty. Suit by the Hanna Transit Company against the steamer Alexander McDougall and the barge W. Le Baron Jenney; the Pittsburgh Steamship Company, claimant. Decree for claimant.

Goulder, White & Garry and W. M. Connelly, all of Cleveland, Ohio, for libelant.

Kelley & Cottrell, of Cleveland, Ohio, for claimant.

HAZEL, District Judge. The large freight steamer Howard M. Hanna, Jr., grounded on the late afternoon of October 12, 1916, at the head of Little Rapids Cut (a channel 300 feet wide) in St. Marys river, while downbound with a cargo of iron ore from Lake Superior to a Lake Erie port, owing, as the libel states, to crowding her over and obstructing her proper course by the steamer Alexander McDougall and her tow, the barge the W. Le Baron Jenney, upbound, and preventing her coming around into Little Rapids Cut under port

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Decree affirmed 279 Fed. 899.

helm, causing her to fetch up on the easterly side of the channel at the Red Nun buoy No. 22.

It was a dark and rainy evening at the time of the mishap, but the beacon and range lights were plainly visible. To sustain the libel there was testimony that the master of the Hanna (so called for brevity), while the ship proceeded at half speed with a 1½-mile current (10 miles an hour over the ground) in St. Marys river, first saw the double mast headlight (indicating tow) of the McDougall when just below the Soo locks near the lower end of Bayfield Rocks, known as the Dyke, or about half a mile above the North Entrance Light at the head of Little Rapids Cut, and, checking her speed, continued a little to the northward of the Bayfield Ranges; that the McDougall at this time was making her turn around the North Entrance Light, steering on the Bayfield Ranges, her distance from the Hanna then being about half a mile. Two-blast signals were exchanged. The Hanna checked to slow and veered a little to the northward, while the McDougall, it is claimed, came so slowly from the turn that she did not have proper control of her barge, and therefore the latter negligently failed to make the turn properly or seasonably to enable the Hanna to swing into Little Rapids Cut under a port helm in the ordinary and usual manner in which steamers of her dimensions maneuver to accomplish such purpose; that she was required to hold steady in the current in order to clear the barge's stern, but that when the barge was clear she could not make the turn, in spite of the fact that her helm was to port. The Hanna could not proceed ahead or to the left since the water ahead and to her left side was shallow.

On behalf of the respondent vessels it is asserted that neither is at fault for the stranding; that they were skillfully navigated, and in the usual and ordinary way turned from Little Rapids Cut into the river; that the McDougall at first had out a line of 200 feet reaching to the Jenney, which was shortened to within 100 feet, but that her direction upon turning from the cut was to southward of the Bayfield Rock Range; that she promptly replied by an assenting whistle to the two-blast signal blown her by the Hanna, but that such signal was not given until after the tow in fact had turned into the river when the McDougall headed further to southward thus giving ample turning space to the Hanna, and passing her in the neighborhood of Bayfield Rock. If such was the actual position of the vessels, then concededly the steamers in question passed each other so far up the river that the turning movement of the Hanna could not possibly have been influenced by any delayed progress of the barge in her turning from Little Rapids Cut into the river.

The issue presented is narrow. The deciding point is whether the upbound steamer and barge were so located at the time of passing the downbound steamer as to have negligently interfered with her navigation. It is unquestionably the rule that the burden of proof is upon the libelant to prove negligent navigation of the McDougall and Jenney, or either of them. The George W. Peavey, 183 Fed. 571, 106 C. C. A. 117. It is concededly difficult for witnesses aboard a vessel on a dark night to accurately state the rate of speed of the other vessels, and even

estimates of distances apart should be received with caution, since in either case the testimony is largely based upon surmise and presumption.

Six witnesses testified for libelant to sustain the allegation of negligent delay by the tow at the entrance to the channel. Three were aboard the Hanna, to wit, the master, the mate, and the lookout, whose version is that their vessel, at the time the tow became a factor in her navigation, was proceeding under check to allow the barge opportunity to clear the channel at the usual turn. The barge, however, they say proceeded so slowly ahead that porting by the Hanna alone prevented impact at the axial line to the center of Little Rapids Cut, where it was imperatively required the turning into the channel occur. Capt. Call, of the Hanna, testified that when the pilot house of the Hanna was abreast of the McDougall's stern the vessels were apart about 150 to 200 feet, and he then heard the barge sound four sharp whistles to the towing steamer, implying a request for increased speed. But he did not, in my opinion, interpret the signals correctly, since Capt. Benson, of the barge, testified that, while turning into the river at the North Entrance Light, he heaved in the tow line, which had sagged, and blew a signal to the towing steamer of four short blasts on the small whistle, indicating "attention," since he had heaved too far to the steamer's stern.

Capt. Call further testified that, when the barge completed her turn into the river, he put the Hanna's wheel hard aport, and signaled the engineer full speed ahead; he plainly saw the light at the entrance to Little Rapids Cut, and, though striving to turn into the channel, his efforts were futile. He indicated by marks on the chart of the locality (Respondent's Exhibit A) three different points where in his judgment he passed the stern of the barge Jenney, putting it first about 600 feet south of the Bayfield Rock Range, then on the center line of Little Rapids Cut and abreast of the entrance light, a little closer to the range; but later on in his testimony he located the stern of the barge at passing eastward of Little Rapids Cut and at about 300 feet from the range. His version that the barge was sailing north of the range when he prepared to turn is unsupported by his marks on the chart. The testimony, therefore, that there was a blocking of his course eastward of the line, becomes a matter of scrutiny.

Putnam, mate of the Hanna, states that the Jenney's stern was abreast of the light when the Hanna passed, and was "dead on the Bayfield Rock Range," which would be more than 600 feet from where Capt. Call thought that she was at such time. The Hanna, he swore, was holding up to the wind and the barge was tailing down across the course. But in this I think he was mistaken. No doubt the speed of the McDougall was greatly reduced further on up the river, as the witness Taylor testified; but this does not prove that her speed in turning from Little Rapids Cut was such as to interfere with the Hanna's turning into the channel.

There also was testimony by Capt. Maddigan of the steamer Tomlinson, upbound, and Capt. Bennett, of the steamer Widlar, downbound, who were in the vicinity. The former stated that the Mc-

279 F.—57

Dougall and tow were about half a mile astern of his vessel when they turned from the cut at Bayfield Rock Range, going in the direction of the Soo locks; that he later passed the Hanna abreast of the lower end of Bayfield Rock Pile. Capt. Bennett stated that he met the McDougall below the turn, and that the Hanna was then nearly a half mile astern of him. If their estimates of distances were approximately correct, then I think libelant would be entitled to recover. But the evidence of the respondents is such as to warrant, I think, a different conclusion as to the places where these vessels met and passed each other.

In support of respondents' contention that the libeled vessels were free from fault, there was produced an official record kept by Mr. Davidson, of the Coast Guard Service, whose duty it was to record the time of passages of vessels in either direction through Little Rapids Cut. He was in the lookout station near the North Entrance Light when the Tomlinson, Widlar, and McDougall passed. It appears that the Tomlinson entered Little Rapids Cut at 5:07 o'clock, passed the lookout station at 5:13, and the North Entrance Light at 5:17 o'clock p. m. The McDougall entered at 5:14, passed the lookout station at 5:20, and the North Entrance Light at 5:24 o'clock p. m.; while the Widlar entered from the North Entrance at 5:21, passing the lookout station at 5:27, and leaving the Cut at 5:34 o'clock p. m. Even though the records may not be entirely accurate, any deductions therefrom may fairly be considered as tending to corroborate respondents' witnesses and in connection with the probabilities arising from the situation.

It is true, as said by Judge Wallace, in The Royal, 54 Fed. 240, 4 C. C. A. 285, that mathematical calculations seldom form a solid basis for judgment; but in this case calculations of speed in connection with time tend to establish the truthfulness of oral testimony of a more positive and definite character. Ingenious theories alone are not relied upon here, as was the case in The John Craig (D. C.) 66 Fed. 596. On a close question of fact, such as we have here, any information from the records in question tending to show the unlikelihood of either the McDougall or her barge contributing to libelant's misfortune may be persuasive. The inferences that the Tomlinson passed the Hanna nearly a mile beyond the point where Capt. Maddigan believed the passing occurred, and that the Widlar was about a mile ahead of the Hanna when she turned into Little Rapids Cut, instead of a half mile, as estimated by her mate, are not altogether unreasonable, and, when considered with the oral evidence showing speed and location, their probative value becomes significant.

The master of the McDougall, the lookout, and the wheelsman, who were on the deck of the steamer, and several witnesses who were on deck of the Jenney, testified that at the time of passing libelant's steamer the McDougall was above the Bayfield Rock Pile, while the barge was approximately abreast thereof, and proceeding southward of the Bayfield Range, and that at no time was the barge across the channel at the North Entrance Light, or in a position north of the range line.

Aside from such testimony, it is shown that the small tender Clover entered Little Rapids Cut from the south, and her master observed the

McDougall (a mile distant) turning at the North Entrance. The tender was running at a speed of 9 miles an hour through the water, and upon reaching the lookout station her master saw the Hanna's bow passing the crib light and coming across the bow of the tender. He immediately signaled the Hanna, and upon receiving no reply he signaled again. Regarding the position and movements of the Hanna he testified:

"Q. How much farther down had the Hanna gone when you blew the first alarm to her? A. Her stern had cleared the line, that line (middle line of the Cut).

"Q. Her stern was clear to the 500-foot point where the Bayfield Range crosses the middle of the Cut? A. Yes, sir. * * * She had not started to make the turn.

"Q. When did he first start to make his turn, as near as you could see? A. I should judge possibly a minute after I blew the second alarm that he threw his wheel hard aport and came past."

He further said the McDougall had proceeded up the river, and though he did not pay much attention to her he was certain that she had passed the Hanna, and he judged her to be in the vicinity of the Bayfield Rock. Such testimony by a disinterested witness is believed important, since it is shown to be consistent with other testimony tending to show that the mishap occurred without the fault of the upbound tow.

It is perhaps unnecessary to go beyond such a finding, but it may not be amiss to state that in my view the accident is fairly explained by the overcautiousness of Capt. Call who, because of the presence of the tow, proceeded somewhat farther over to the northward of the Bayfield Rock Range than was customary, and in the circumstances he should have ported earlier, and should not have waited until he was abreast, or nearly abreast, of the Rapids Light, since the barge had seasonably cleared the channel. To then port for making the turn was an error of judgment, which was excusable, perhaps, by the existing weather conditions. But, in the light of all the evidence, I am of opinion that it is not proven that the stranding in question was attributable to any negligence on the part of the respondents. The barge, of course, was under the control of her steamer, and I discover no cause of complaint in the manner in which she was steered or handled.

The libel should be dismissed, with costs.